UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

ENTERGY NEW ORLEANS, LLC                    CIVIL ACTION

VERSUS                                         NO. 22-5285

MAGNOLIA FLEET, LLC, ET AL.              SECTION "R" (5)

## ORDER AND REASONS

Before the Court is defendants' motion for summary judgment[1] and motion *in limine* to exclude the expert testimony of Randy Bullard.[2]  Plaintiff opposes the motions.[3]  For the following reasons, the Court denies the motion for summary judgment, and grants in part and denies in part the motion *in limine*.

## I.    BACKGROUND

This case arises from a maritime allision in the Inner Harbor Navigation Canal ("Inner Harbor").  On December 15, 2021, the tugboat vessel "The M/V Lucille Brooks," owned by defendant Magnolia Midstream, LLC and operated by defendant Magnolia Fleet, LLC, struck a sign and two concrete-filled steel pilings owned by plaintiff Entergy New Orleans, LLC

---

[1]     R. Doc. 26.
[2]     R. Doc. 32.
[3]     R. Docs. 27 & 38.

("Entergy").[4]   At the time of the allision, the vessel was pushing a tow consisting of five empty barges through the locks in the Inner Harbor.[5]   The vessel's engine allegedly failed, causing winds to push the tow into Entergy's pilings located on the eastside bank of the canal.[6]   The damaged pilings were 36 inches in diameter and used to mark the location of two 16-inch gas main pipeline pilings that cross under the Inner Harbor.[7]   There were four pilings in total, two of which were undamaged by the allision.

Entergy filed this action against Magnolia Midstream, LLC, Magnolia Fleet, LLC, and Magnolia Tugs, LLC (collectively, "Magnolia"), seeking reimbursement for all repair costs necessitated by the allision.[8]   The dispute centers on the amount of damages Magnolia owes to Entergy.  In Magnolia's motion for summary judgment, it contends that damages must be based on the market value of the two pilings at the time of the destruction less the salvage value.[9]   Entergy contends that the proper measure of damages is repair or replacement cost less depreciation.[10]

---

4    R. Doc. 26-4 ¶¶ 1, 5; R. Doc. 27-3 ¶¶ 1, 5.
5    R. Doc. 26-4 ¶ 1; R. Doc. 27-3 ¶ 1.
6    R. Doc. 26-4 ¶¶ 4-5; R. Doc. 27-3 ¶¶ 4-5.
7    R. Doc. 26-4 ¶ 5; R. Doc.27-3 ¶ 5.
8    R. Docs. 1 & 15.
9    R. Doc. 26-1.
10   R. Doc. 27.

Magnolia also moves to exclude the testimony and report of Entergy's maritime expert surveyor, Randy Bullard.[11]  Magnolia asserts that the report is unreliable because it contains unsupported assumptions, extends beyond Bullard's expertise, and lacks credible sources.[12]   Entergy asserts that Bullard's report is admissible, and that Magnolia's objections concerning the weight of Bullard's opinions are more properly addressed at trial.[13]

The Court considers the motions below.

## II.    MOTION FOR SUMMARY JUDGMENT

### A.    Legal Standard

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam).  "When assessing whether a dispute to any material fact exists, [the Court] consider[s] all of the evidence in the record but refrain[s] from making credibility determinations or weighing the evidence."  *Delta & Pine Land Co. v. Nationwide Agribusiness*

---

[11]    R. Doc. 32.
[12]    R. Doc. 32-1.
[13]    R. Doc. 38.

*Ins.*, 530 F.3d 395, 398-99 (5th Cir. 2008) (first citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); and then citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).   All reasonable inferences are drawn in favor of the nonmoving party, but "unsupported allegations or affidavits setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion for summary judgment." *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985) (quoting 10A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2738 (2d ed. 1983)); *see also Little*, 37 F.3d at 1075 (noting that the moving party's "burden is not satisfied with 'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' by 'unsubstantiated assertions,' or by only a 'scintilla' of evidence" (citations omitted)).   "No genuine dispute of fact exists if the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *EEOC v. Simbaki, Ltd.*, 767 F.3d 475, 481 (5th Cir. 2014).

If the dispositive issue is one on which the moving party will bear the burden of proof at trial, the moving party must put forth evidence that would "entitle it to a directed verdict if the evidence went uncontroverted at trial." *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1264-65 (5th Cir. 1991) (quoting *Golden Rule Ins. v. Lease*, 755 F. Supp. 948, 951 (D. Colo. 1991)

4

(internal quotation marks omitted)).  "[T]he nonmoving party can defeat the motion" by either countering with evidence sufficient to demonstrate the "existence of a genuine dispute of material fact," or by "showing that the moving party's evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party."  *Id.* at 1265.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by pointing out that the evidence in the record is insufficient with respect to an essential element of the nonmoving party's claim.  *See Celotex*, 477 U.S. at 325.  The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists.  *See id.* at 324.  The nonmovant may not rest upon the pleadings but must identify specific facts that establish a genuine issue for resolution.  *See, e.g.*, *id.*; *Little*, 37 F.3d at 1075 ("Rule 56 'mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" (quoting *Celotex*, 477 U.S. at 322)).

5

**B.     Discussion**

As this matter falls within the Court's admiralty jurisdiction, substantive maritime law, which incorporates common law tort principles, applies. *See McCormick v. United States*, 680 F.2d 345, 347-48 (5th Cir. 1982) (allision between vessel and piling in navigable waters came within admiralty jurisdiction); *see also Great Lakes Bus. Tr. v. M/T Orange Sun*, 855 F. Supp. 2d 131, 148 (S.D.N.Y. 2012) ("Federal maritime law incorporates common law negligence principles generally." (quoting *Becker v. Poling Transp. Corp.*, 356 F.3d 381, 388 (2d Cir. 2004)). In this context, an award of damages serves a compensatory purpose. *See Pizani v. M/V Cotton Blossom*, 669 F.2d 1084, 1088 (5th Cir. 1982). "The purpose of compensatory damages . . . is to place the injured person as nearly as possible in the condition he would have occupied if the wrong had not occurred." *Id.* (quoting *Freeport Sulphur Co. v. S/S Hermosa*, 526 F.2d 300, 304 (5th Cir. 1976) (internal quotation marks omitted)); *see also Gaines Towing & Transp., Inc. v. Atlantia Tanker Corp.*, 191 F.3d 633, 635 (5th Cir. 1999) ("The proper measure of damages in a tort action 'is to place the injured person as nearly as possible in the condition he would have occupied if the wrong had not occurred.'" (quoting *Pizani*, 669 F.2d at 1088)); *Pillsbury Co. v. Midland Enters., Inc.*, 715 F. Supp. 738, 763 (E.D. La. 1989) ("Under

6

general maritime law, 'where property is destroyed by wrongful act, the owner is entitled to its money equivalent, and thereby to be put in as good a position pecuniarily as if his property had not been destroyed.'" (quoting *Standard Oil Co. v. S. Pac. Co.*, 268 U.S. 146, 155 (1925))).  Defendants "cannot be held liable for damages that [they have] not been shown to have caused, or for the cost of repairs that enhance the value of the damaged property compared with its pretort condition." *Gaines Towing*, 191 F.3d at 635 (citing *Pizani*, 669 F.2d at 1088).  Plaintiff must prove both the amount and the fact of damages.  *See Pizani*, 669 F.2d at 1088; *Gaines Towing*, 191 F.3d at 635.

Property damaged in an allision is considered a "constructive total loss" when the repair cost exceeds the precasualty value of the property, or an "actual total loss" when damaged beyond physical repair.  *Pillsbury Co.*, 715 F. Supp. at 763 (citations omitted).  "In either case, the measure of damages is generally the market value of the property just before the loss (less the value of any salved equipment or materials) and does not include loss of use or other consequential damages."  *Id.* (citations omitted).

But when there is no established market value "by recent and comparable sales," courts rely upon "other evidence such as replacement cost, depreciation, expert opinion, and the amount of insurance" to

determine the value of damaged property. *Carl Sawyer, Inc. v. Poor*, 180 F.2d 962, 963 (5th Cir. 1950) (holding that "other evidence is admissible touching value" when market value is not established); *Pillsbury Co.*, 715 F. Supp. at 763 (quoting *King Fisher Marine Serv., Inc. v. NP Sunbonnet*, 724 F.2d 1181, 1185 (5th Cir. 1984) (internal quotation marks omitted)); *see also Freeport Sulphur Co.*, 526 F.2d at 304 ("When there is a tortious injury to property and the market value of that property is unknown, the amount of damages must be determined by the cost of repairs to the property."); *Orange Beach Water, Sewer, & Fire Prot. Auth. v. M/V Alva*, 680 F.2d 1374, 1384 (11th Cir. 1982) ("Where no market value has been established by recent comparable sales, 'other evidence is admissible touching value such as the opinion of marine surveyors, engineers, the cost of reproduction, less depreciation, the condition of repair which the (structure) was in, . . . and the like." (alteration in original) (quoting *Carl Sawyer, Inc.*, 180 F.2d at 963 (5th Cir. 1950))).  For instance, when the property was used for a special purpose, or "there otherwise may be no true market, replacement costs may be the most accurate basis for determining damages, which are recoverable whether or not the property is repaired or replaced." *Pillsbury Co.*, 715 F. Supp. at 763 (citing *King Fisher*, 724 F.2d at 1185-87; *Bunge Corp. v. Am. Com. Barge Line Co.*, 630 F.2d 1236, 1242 (7th Cir. 1980); and *United*

*Overseas Export Lines, Inc. v. Medluck Compania Maviera, S.A.*, 785 F.2d 1320, 1327 (5th Cir. 1986)).

In these "new for the old" cases, the "party suffering injury is entitled to recover only that which is necessary to restore his damaged property to the same condition as existed immediately prior to the delict." *City of New Orleans ex rel. Sewerage & Water Bd. of New Orleans v. Am. Com. Lines, Inc.*, 662 F.2d 1121, 1124 (5th Cir. 1981). In other words, when "repair or replacement costs form the basis of the damage award, the Court must determine whether the repair or replacement adds new value to or extends the useful life of the property." *Pillsbury Co.*, 715 F. Supp. at 763 (citations omitted). If it does, then the Court must make "an appropriate reduction from the full repair or replacement costs." *Id.* (citations omitted). The purpose of this rule is to "avoid giving the injured person a windfall by furnishing something entirely new 'for that which was old and depreciated and would in the normal course of things have to be replaced in any event.'" *Sewerage & Water Bd. of New Orleans*, 662 F.2d at 1124 (quoting *State Highway Comm'n v. Tug Go-Getter*, 468 F.2d 1270, 1273 (9th Cir. 1972)).

Here, the issue is whether the fair market value of the damaged pilings immediately before the loss can be discerned. If so, the market value at the time of the loss is the proper basis for determining damages. *See Carl*

*Sawyer*, 180 F.2d at 963 ("[T]he usual and customary method in determining damages in cases of maritime collision is the market value of the [property] in the case of loss.").  If not, replacement cost is the more suitable basis.  *See Pillsbury Co.*, 715 F. Supp. at 763.

The property at issue is two concrete-filled steel pilings partially submerged in water that were installed between 39 and 42 years before the allision.[14]  Entergy asserts that there is no resale or general trading market for property of this nature.[15]  This position comports with a number of cases that have either used the replacement-cost approach to calculate damages for marine structures such as pilings, docks, mooring cells, and mooring dolphins, or held that no general, trading market exists for these structures. *See Pizani*, 669 F.2d at 1086 (using replacement cost of dock pilings, less noncompensable improvements, to determine damages in maritime allision case); *Freeport Sulphur Co.*, 526 F.2d at 306 (calculating damages for dock as the cost of repairs less "the percentage of the repair expenses representing the cost of the useful life extension"); *Pillsbury Co.*, 715 F. Supp. at 763-65 (holding that replacement costs "are the best indicia of 'market value'" of mooring cell and mooring dolphin damaged in allision because "no general,

---

[14]    *See* R. Doc. 26-4 ¶ 30; R. Doc. 27-3 ¶ 30.
[15]    R. Doc. 27 at 10.

trading market exists" for these structures); *Allied Chem. Corp. v. Edmundson Towing Co.*, 320 F. Supp. 448, 449 (E.D. La. 1970) (using the replacement cost of damaged piling clusters, less reasonable depreciation, to calculate damages); *Gen. Am. Transp. Corp. v. The Patricia Chotin*, 120 F. Supp. 246, (E.D. La. 1954) (using replacement cost of piling clusters, less depreciation, to calculate damages); *see also Bunge Corp. v. Am. Comm. Barge Line Co.*, 630 F.2d 1236, 1240-42 (7th Cir. 1980) (using replacement cost, less depreciation, to calculate damages to conveyor structure and dolphin); *Orange Beach*, 680 F.2d at 1379-80, 1383-84 (using replacement cost, less depreciation, to calculate damages to pipeline beneath waterway).

While Magnolia argues that the market-value standard must be used to calculate damages for the pilings, it neither cites authority applying this standard to comparable structures, nor offers evidence for the counterintuitive proposition that there is a resale or trading market for decades-old steel pilings filled with concrete. Accordingly, the Court finds that replacement cost, less depreciation and noncompensable improvements, may be used as the more appropriate measure of damages. Because Magnolia has failed to demonstrate that the damages in this case must be determined using the market-value standard, the Court denies its motion for summary judgment.

Magnolia also argues that Entergy has no evidence of the pretort condition of the pilings.[16]  In response, Entergy has cited witness testimony and satellite imaging on the pilings' condition before the allision, including testimony from Magnolia's deckhand, Brandan Winkel.[17]  Magnolia contests the credibility of Entergy's evidence, but credibility determinations have no place in summary judgment.  *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (holding that on summary judgment a court "may not make credibility determinations or weight the evidence").  The Court finds that there are issues of material fact as to the pretort condition of the pilings precluding summary judgment.

## III.   MAGNOLIA'S MOTION *IN LIMINE*

### A.    Legal Standard

The district court has considerable discretion to admit or exclude expert testimony under Federal Rule of Evidence 702.  *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 138-39 (1997); *Seatrax, Inc. v. Sonbeck Int'l, Inc.*, 200 F.3d 358, 371 (5th Cir. 2000).  Rule 702 provides that an expert witness

---

[16]    R. Doc. 26-1 at 2, 5-6.
[17]    R. Doc. 27 at 4.

"qualified . . . by knowledge, skill, experience, training, or education may testify" if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

In *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), the Supreme Court held that Rule 702 "requires the district court to act as a gatekeeper to ensure that 'any and all scientific testimony or evidence admitted is not only relevant, but reliable.'" *Metrejean v. REC Marine Logistics, LLC*, No. 08-5049, 2009 WL 3062622, at *1 (E.D. La. Sept. 21, 2009) (quoting *Daubert*, 509 U.S. at 589). This gatekeeping function applies to all forms of expert testimony. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999).

The Court's gatekeeping function consists of a two-part inquiry into reliability and relevance. First, the Court must determine whether the proffered expert testimony is reliable. The party offering the testimony bears the burden of establishing its reliability by a preponderance of the evidence. *See Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998). The

reliability inquiry requires the Court to assess whether the expert's reasoning and methodology underlying the testimony are valid. *See Daubert*, 509 U.S. at 593. The aim is to exclude expert testimony based merely on subjective belief or unsupported speculation. *See id.* at 590. "[F]undamentally unsupported" opinions "offer[ ] no expert assistance to the [trier of fact]" and should be excluded. *Guile v. United States*, 422 F.3d 221, 227 (5th Cir. 2005). The Court may consider several nonexclusive factors in determining reliability, including: (1) whether the technique has been tested, (2) whether the technique has been subject to peer review and publication, (3) the technique's potential error rate, (4) the existence and maintenance of standards controlling the technique's operation, and (5) whether the technique is generally accepted in the relevant scientific community. *Burleson v. Tex. Dep't of Crim. Just.*, 393 F.3d 577, 584 (5th Cir. 2004). The Supreme Court has emphasized that these factors "do not constitute a 'definitive checklist or test.'" *Kumho*, 526 U.S. at 150 (quoting *Daubert*, 509 U.S. at 593). Rather, courts "have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Id.* at 152.

Expert testimony "must be reliable at each and every step or else it is inadmissible." *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 355 (5th

Cir. 2007). "The reliability analysis applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, the link between the facts and the conclusion, et alia." *Id.* (quoting *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 155 (3d Cir. 1999) (internal quotation marks omitted)). "Where the expert's opinion is based on insufficient information, the analysis is unreliable." *Paz v. Brush Engineered Materials, Inc.*, 555 F.3d 383, 388 (5th Cir. 2009). Further, the Supreme Court has explained that "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert." *Joiner*, 522 U.S. at 146. Rather, "[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Id.*

Second, the Court must determine whether the expert's reasoning or methodology "fits" the facts of the case, and whether it will thereby assist the trier of fact to understand the evidence. In other words, it must determine whether it is relevant. *See Daubert*, 509 U.S. at 591. "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Id.* (quoting 3 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 702[02] (1988)).

The Court also considers this motion recognizing that the case involves a non-jury trial.  In *Daubert*, the Supreme Court's overriding concern was the problem of exposing the jury to confusing and unreliable expert testimony.  *Id.* at 595-97.  Following *Daubert*, several courts have recognized that in the context of a bench trial the *Daubert* gatekeeping obligation is less pressing.  *See, e.g.*, *Gibbs v. Gibbs*, 210 F.3d 491, 500 (5th Cir. 2000) ("Most of the safeguards provided for in *Daubert* are not as essential in a case such as this where a district judge sits as the trier of fact in place of a jury."); *Seaboard Lumber Co. v. United States*, 308 F.3d 1283, 1301-02 (Fed. Cir. 2002) (explaining that in a bench trial the *Daubert* standard must still be applied but the concerns about expert evidence misleading a jury "are of lesser import").  Nevertheless, *Daubert* still applies in bench trials, and this Court must ensure that the proffered testimony is reliable.  *See Gibbs*, 210 F.3d at 500.

## B.   Discussion

Magnolia's motion *in limine* addresses the admissibility of Entergy's maritime survey expert, Randy Bullard.[18]  Bullard presents an expert report in which he opines that the remaining usable life of the damaged pilings was

---

[18]   R. Docs. 32 & 32-1.

60 to 70 years at the time of the allision,[19] and the total replacement cost for the pilings is $151,083.64.[20]  He based the usable life calculation on several opinions expressed in the report, including that: (1) the apparent original thickness of the pilings was 1/2 inch based on industry standard practices, the existing wall thickness, and remaining coatings;[21] (2) the damaged pilings were in position and undamaged before the allision based on Google Earth imagery recorded in November 2021 and a report filed by the Lucille Brooks' captain, James Raybon;[22] (3) the average thickness of the pilings after the allision was 3/8 inch based on readings obtained from ultrasonic thickness readings;[23] (4) the pilings were 39.5 to 42.5 years old at the time of the allision based on pile permit documents; (5) there was a loss of 1/8 inch or 20% over the lifespan of the pilings; and (6) the estimated total usable lifespan of the pilings was 100 to 110 years based on studies of steel pipe piles in freshwater environments.[24]

Magnolia now moves to exclude Bullard's testimony on the grounds that it lacks foundation, relies on irrelevant sources, asserts opinions beyond

---

[19]   R. Doc. 32-2 at 9-10.
[20]   *Id.* at 9.
[21]   *Id.* at 2, 6.
[22]   *Id.* at 5, 81.
[23]   *Id.* at 6.
[24]   *Id.* at 6-7.

Bullard's expertise, and lacks credible sources detailing the pretort condition of the pilings.[25]  The Court addresses each of Magnolia's *Daubert* objections in turn.

### 1.   *Not Based upon Sufficient Facts and Data*

Magnolia first contests the reliability of Bullard's report because it contains unsupported assumptions about the original thickness of the pilings, which Bullard uses to calculate the rate of deterioration.  Magnolia specifically asserts that the report utilizes the "assessment of industry standard practices" to determine the 1/2-inch thickness, but Bullard does not cite to any source supporting this conclusion.[26]

Bullard recognizes in his report that the installation drawings attached to the permit for the four concrete-filled steel pilings did not identify the pilings' original thickness.[27]  He was thus required to infer their original thickness.[28]  Bullard's inferential determination was based on "industry standard practices," without elaboration.

---

[25]   R. Doc. 32-1.
[26]   *Id.* at 6-7.
[27]   R. Doc 32-2 at 6, 83, 93-94.
[28]   *Id.* at 2, 6.

Bullard has more than eighteen years of experience working as a marine surveyor and salvage master and is the Principal of a marine surveying company.[29]  He was certified by the Association of Certified Marine Surveyors in 2010 and is accepted as a marine survey expert in this Court and the Southern District of Alabama.[30]  And Bullard states in his report that he based his findings in part on his extensive experience "as a certified marine surveyor conducting inspections, investigations, surveys, and root cause analyses as related to marine incidents."[31]  The Court finds that Bullard's reliance upon his training and experience to testify about the industry standard for piling thickness does not render his opinion unreliable or inadmissible.  *See, e.g.*, *Williams v. Manitowoc Cranes, L.L.C.*, 898 F.3d 607, 625 (5th Cir. 2018) (holding that expert with lengthy career working with cranes and crane controls understands industry standards for safety warnings and district court did not err in qualifying him as a warnings expert); *United States v. Empire Bulkers, Ltd.*, No. 21-126, 2022 WL 1811158, at *4 (E.D. La. June 2, 2022) (allowing defendant's maritime expert to testify, "to the extent that he can within his expertise, as to relevant industry standards and expectations").

---

[29]    *Id.* at 4; R. Doc. 32-3.

[30]    R. Doc. 32-3.

[31]    R. Doc 32-2 at 4.

Magnolia may challenge any of Bullard's inferences and assumptions about the piling-wall thickness at trial on cross-examination and with countervailing expert testimony. *See Williams*, 898 F.3d at 625 ("[T]his battle should be fought with the conventional weapons of cross-examination and competing testimony — not the nuclear option of exclusion." (citing *Daubert*, 509 U.S. at 596)); *United States v. 14.38 Acres of Land, More or Less Situated in Leflore Cnty., State of Miss.*, 80 F.3d 1074, 1077 (5th Cir. 1996) ("As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration." (quoting *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987) (internal quotation marks omitted))).

### 2. *Reliance on Irrelevant Sources and Assertion of Opinions Beyond Expertise*

Magnolia also argues that Bullard's reliance on two documents in determining the expected useful life of the pilings in the Inner Harbor renders his opinion unreliable.[32]  Bullard first cites to a guidance note by the Steel Piling Group from November 2020 in support of his conclusion that

---

[32]    R. Doc. 32-1 at 7-8.

"steel pipe piles in freshwater environments can regularly achieve useable lifespans in excess of 125 years."[33]  The guidance note specifically states that, "[f]or situations where limited deterioration rate is applicable and/or economic protective measures can be employed, design lives [of steel piles] in excess of 125 years can regularly be achieved."[34]  This guidance note bases the information it provides on steel pile design guidance found in the United Kingdom, and on durability information provided within the United Kingdom National Annex for different environmental conditions.[35]

Bullard also cites to a 2020 study entitled "Environmental Impact on Corrosion Rates of Steel Pipes Employed in Marine Environment."[36]  This study examined corrosion rates based on two environmental variables: (1) water temperature, for which the researchers examined the monthly average maximum and minimum water temperatures in Cork, Ireland; and (2) the availability of dissolved inorganic nitrogen ("DIN") in the water, based on a threshold value used by the Environmental Protection Agency of Ireland.[37]  Based on these environmental factors, the researchers concluded that the capacity of a steel piling to resist buckling will reduce by about 41%

---

[33]     R. Doc. 32-2 at 6, 132-134.

[34]     *Id.* at 132.

[35]     *Id.* at 132.

[36]     *Id.* at 6, 135-141.

[37]     *Id.* at 138-139, 141.

after 81 years of exposure.[38]   Bullard utilizes this study to extrapolate a matching 40% deterioration loss at an effective lifespan of 79 years for Entergy's two damaged pilings.[39]

Magnolia contends that these reports are geographically limited to the United Kingdom and Ireland, and they cannot be applied to the pilings in the different conditions of the Inner Harbor in New Orleans, Louisiana.[40] Magnolia specifically argues that the Inner Harbor "has an entirely different mud bottom, geology, underwater currents, and temperatures" than the conditions relied upon in the studies.[41]  It also argues that Bullard, who is not a geologist or metallurgist, "lacks the requisite expertise" to determine that Entergy's pilings would deteriorate at the same rate as steel pilings of unknown composition in vastly different environments.[42]  Thus, without any data likening the conditions of the United Kingdom and Ireland to those in the Inner Harbor, Magnolia concludes that Bullard's findings are unreliable.[43]   Entergy contends that the documents are more broadly

---

[38]     *Id.* at 140.
[39]     *Id.* at 6.
[40]     R. Doc. 32-1 at 7-8.
[41]     *Id.*
[42]     *Id.*
[43]     *Id.*

applicable and "pertain to coastal and marine environments around the world."[44]

To the extent that Magnolia challenges Bullard's qualifications to render an opinion about the condition and useful life of the pilings, the Court finds no merit in this objection. *See Cashman Equip. Corp. v. Rozel Operating Co.*, No. 08-363, 2012 WL 2519970, at *5-6 (E.D. La. June 28, 2012) (finding expert's testimony reliable and relevant when based on experience as marine surveyor even when he had no experience as a metallurgist). Although Bullard may not be a metallurgist or geologist, he is "not strictly confined to his area or practice" and may properly testify "regarding related applications." *Id.* at *6. And Bullard's "lack of specialization does not affect the admissibility of the opinion, but only its weight." *Id.* (quoting *Wright v. John Deere Co.*, 935 F.2d 1090, 1100 (10th Cir. 1991) (internal quotation marks omitted)).

Nevertheless, the Court finds that Bullard's opinions founded upon the two cited documents are unreliable, and any portion of his report based on these documents is inadmissible. First, the Steel Piling Group document does not even purport to be a "study," but rather is a "guidance note."[45] It

---

44   R. Doc. 38 at 8-9.
45   R. Doc. 32-2 at 132-34.

contains no data or information about the methods used to make the statement about the potential useable life of steel pilings in the United Kingdom. Nor does the guidance note include the professional qualifications of its authors. Moreover, the document is based upon U.K. standards and is clearly aimed towards the U.K. steel-piling industry. It does not even purport to suggest that these standards or the information it provides apply generally outside of the United Kingdom, and Bullard does not attempt to reconcile geographic disparities with New Orleans. Without any evidence that the potential useable life statement in the Steel Piling Group document is reliably derived and applicable to the facts and conditions of this case, Bullard's opinion about the useable life of Entergy's pilings is unreliable and must be excluded. *See Brock v. Merrell Dow Pharms., Inc.*, 874 F.2d 307, 309-10 (5th Cir. 1989) ("[C]ourts must critically evaluate the reasoning process by which experts connect data to their conclusions in order for courts to consistently and rationally resolve the disputes before them."); *Joiner*, 522 U.S. at 146 (holding that a court may exclude an expert's analysis "if there is simply too great an analytical gap between the data and the opinion offered").

The 2020 "Environmental Impact" study likewise is an unreliable basis for Bullard's opinions. This study indisputably utilizes data from Ireland to

calculate the rate of corrosion for steel piles in marine environments.[46]  For instance, the study utilizes the average water temperatures in Cork, which was recorded as 12.56 degrees Celsius (54.61 degrees Fahrenheit) in 2019.[47]  The study also bases its calculations on DIN levels found in Ireland.[48]  Bullard fails to explain how Ireland's environmental conditions are comparable to those in New Orleans' Inner Harbor, which is significant since these regions are more than 4,000 miles apart in geographically distinct locations.  Indeed, the study itself acknowledges that the water temperature and DIN levels of a particular environment have large effects on corrosion rates.[49]  Bullard also fails to explain how the study's finding of a 41% reduction in buckling resistance supports, or in any way relates to, his opinion on the deterioration of Entergy's pilings.  The study predicts *future* rates of section loss due to corrosion and loss in buckling resistance projected to occur between 2019 and 2100 based on the anticipated increases in sea water temperature caused by climate change.[50]  Bullard leaves unexplained how the study's predicted rates over the next 80 years is of any relevance to

---

[46]     *Id.* at 138-39.
[47]     *Id.* at 138.
[48]     *Id.* at 139.
[49]     *Id.* at 136, 140.
[50]     *Id.* at 135, 138.

the deterioration rate of pilings that were installed sometime between 1979 and 1982 in the Inner Harbor of New Orleans.

Accordingly, Bullard's opinions based on these two documents—including the expected usable life of Entergy's pilings and the matching deterioration rate—are excluded. *See Allen v. Pa. Eng'g Corp.*, 102. F.3d 194, 199 (5th Cir. 1996) ("[I]f the foundational data underlying opinion testimony are unreliable, an expert will not be permitted to base an opinion on that data because any opinion from that data is likewise unreliable.").

### 3.   *Lack of Credible Sources on Pretort Condition*

Magnolia objects to Bullard's reliance on Google Earth satellite imagery, the statements of an Entergy contractor about the condition of one of the removed pilings, and Bullard's own physical survey of one of the damaged pilings.   The Court finds that Magnolia's critique of the evidence Bullard relies on to establish the pretort condition of the pilings does not render his report lacking in a reliable foundation.

It is undisputed that the Google Earth image is of Entergy's pilings and dated from the month before the allision, and it appears to show the pilings in an upright position.   And Bullard relied only in part on the Google Earth image to form his opinion about the pre-tort condition of the pilings.   In

26

addition to the Google Earth image, Bullard relied on a report filed by the captain of the Lucille Brooks, James Raybon, in which he states that the pilings are "leaning at an angle *now*,"[51] without any indication that they were leaning before the allision.[52]   Bullard also relied on a physical inspection of one of the damaged pilings and his experience in other monopile failure cases to determine where the failure occurred.[53]   His physical survey of the piling revealed "an absence of pre-existing damage to the pile in way of the point of failure as evidenced by a lack of areas of wastage, or excessively thin wall."[54] Magnolia's critique that Bullard's physical survey was conducted after the allision does not negate his observations about the point of failure and the lack of pre-existing damage in the form of wastage or excessively thinned walls.   The Court does not find that the physical survey provided an unreliable basis for Bullard's opinion of the absence of pre-existing damage to the piling at issue.

Magnolia also objects to Bullard's reliance on the observations of Mike Vogt regarding the northernmost pile, which Bullard was unable to inspect at the time of the survey.  Vogt is the contractor hired by Entergy to replace

---

[51]   R. Doc. 26-2 at 2.
[52]   R. Doc. 32-2 at 4-5.
[53]   *Id.* at 7.
[54]   *Id.* at 7.

the pilings and who was allegedly present when both pilings were removed.[55] Bullard specifically refers to Vogt's observations that the noted point of separation of this piling was about six feet sub bottom, that there were no other visible locations of damage or areas of wastage, and that there was intermittent weathered and aged coatings and scattered areas of advanced corrosion blistering. Based on the similarities between Vogt's observations and the piling Bullard actually observed, as well as the similar time of installation and environment, Bullard concluded that "the two piles would be similar in condition and degree of loss."[56] According to Magnolia, Vogt's observations constitute "uncorroborated hearsay," and Bullard's reliance upon them makes his report unreliable.[57] But that Bullard relied on Vogt's statements in forming his expert opinion does not render his testimony or report unreliable. "[A]n expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation." *Daubert*, 509 U.S. at 592. This includes hearsay if "experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject." Fed. R. Evid. 703; *see also Soden v. Freightliner Corp.*, 714 F.2d 498, 502 (5th Cir. 1983) ("[U]nder Rule 703 an expert can

---

[55]   R. Doc. 38 at 3.
[56]   R. Doc. 32-2 at 7-8.
[57]   R. Doc. 32-1 at 3, 9.

discuss as the basis for an opinion facts or data which are otherwise inadmissible hearsay, 'if of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject.'" (quoting Fed. R. Evid. 703)).  Here, Magnolia "has not demonstrated that the hearsay relied upon by [Bullard] would not be reasonably relied upon by other experts in the field."  *Trevelyn Enters., L.L.C. v. SeaBrook Marine, L.L.C.*, No. 18-11375, 2021 WL 65689, at *2 (E.D. La. Jan. 7, 2021).  The Court also notes that both parties have listed Vogt as a witness at trial, which further undermines Magnolia's hearsay objection.[58]

In summary, the Court finds that Magnolia's objections to Bullard's reliance on the Google Earth imagery, his survey of the piling, or Vogt's observations, do not demonstrate that the basis for Bullard's opinion was unreliable.  Magnolia may explore this critique more fully on cross-examination or with countervailing expert testimony.  *See Williams*, 898 F.3d at 625.

---

[58]    R. Docs. 23 & 41.

## IV.   CONCLUSION

For the foregoing reasons, the Court denies Magnolia's motion for summary judgment, and grants in part and denies in part Magnolia's motion *in limine*.

New Orleans, Louisiana, this ___1st___ day of September, 2023.

_____

SARAH S. VANCE
UNITED STATES DISTRICT JUDGE